**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF SOUTH CAROLINA**

**AIKEN DIVISION**

| | | |
|---|---|---|
| MARY M. CUNNINGHAM, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 1:07-02746-RBH-JRM |
| | ) | |
| v. | ) | |
| | ) | |
| AIKEN REGIONAL MEDICAL CENTERS, INC., | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Plaintiff, Mary M. Cunningham ("Cunningham"), filed this case in the Court of Common Pleas for Aiken County. She alleges that her former employer, Aiken Regional Medical Centers, Inc. ("ARMC"), constructively discharged her because of her age in violation of the Age Discrimination in Employment Act ("ADEA"), and in violation of the public policy of South Carolina. ARMC removed the case to this Court pursuant to 28 U.S.C. § 1441(b). Pretrial matters were automatically referred to the undersigned pursuant to Local Rule 73.02(B)(2)(g). ARMC filed a motion for summary judgment on October 15, 2008. Cunningham filed her response on December 12, 2008. ARMC filed its reply on December 22, 2008.

**1. Remand**

In her response to ARMC's motion for summary judgment, Cunningham "withdraws her claim for age discrimination." (Response, 1-2). She recognizes that abandonment of her ADEA claim leaves her with only a state supplemental claim subject to remand at the discretion of the Court. Cunningham states that she "would prefer such a remand." (*Id.* at 2). ARMC argues in its reply that

the case should not be remanded, but that the ADEA claim should be dismissed,[1] and it should be granted summary judgment with respect to Cunningham's supplemental claim.

District courts are authorized to entertain state claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution" under the statutory authorization of 28 U.S.C. § 1367(a). The statute provides that the district courts may decline to exercise supplemental jurisdiction in certain circumstances, such as the one here, where "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). However, the district courts have the discretion to retain jurisdiction. In exercising its discretion, the district court is instructed to consider "convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity, and considerations of judicial economy." Shanaghan v. Cahill, 58 F.3d 106, 110 (4th Cir. 1995).

Although this case involves the application of a federal statute, it is predominated by a question of state policy. Comity suggests that the state forum would be favorable in resolving this dispute. The case is substantially developed and should be remanded to state court for trial.

**2. Supplemental Claim**

The parties have provided an extensive factual presentation, most of which applies to Cunningham's abandoned ADEA claim.[2] Since the only claim remaining is Cunningham's supplemental claim, the undersigned will not engage in a detailed factual analysis. Suffice it to say

---

[1] It is recommended that Cunningham's ADEA claim be dismissed.

[2] Attached to Cunningham's opposition memorandum is Plaintiff's 55 paragraph Declaration which outlines her career and difficulties with ARMC. Defendant characterizes the Declaration as "almost entirely inadmissible because it contains hearsay, legal and factual conclusions, self-serving opinions, vague generalizations, assumptions of fact and argument."

that from mid-2005 Cunningham's work situation was turbulent due in large part to alleged alcohol abuse by her supervisor, Jay Smith ("Smith").

Cunningham is a Licensed Independent Social Worker-Clinical Practice Level and supervised ARMC's Aurora Pavilion, an inpatient psychiatric facility. On January 21, 2006, Cunningham sustained an on the job injury which caused her to miss work. Soon after her return Smith offered Cunningham a new position which Cunningham deemed to be a demotion. Cunningham did not accept the new position and remained as supervisor of Aurora Pavilion. Smith issued Cunningham a disciplinary Corrective Action Report on February 24, 2006.

Cunningham went on leave under the Family and Medical Leave Act ("FMLA") on February 27, 2006. While on leave she filed an internal grievance concerning Smith. Cunningham returned to work on April 7, 2006. On returning to work Cunningham met with Mark Sherry, ARMC Director of Human Resources, and K.D. Justyn, ARMC CEO, to discuss the situation with Smith.

According to Cunningham, and in the light most favorable to her, Smith summoned her to his office on April 17, 2006 and informed her that a

> new Corporate Directive from ARMC required that we no longer would admit patients who were uninsured or had no means to pay. Specifically, we were to refuse admissions from the emergency department, the needs assessment areas of Aurora and/or from community referral sources. I stated to Smith that this would be an EMTALA (Emergency Medical Treatment and Active Labor Act) violation and against federal law if we rejected patients who presented to the hospital for treatment without first medically screening them to determine if they were suffering from an emergency medical condition because they were uninsured or unable to pay. I told him in a firm manner that I would not violate federal law and put my license at risk. I refused his instructions. Smith replied that I would do as directed and that I would direct my staff to do so as well. Again I told him that I refused his instruction on this matter. He ordered me out of his office. I went back to work.

(Pl.Aff., ¶ 44).[3]

Cunningham submitted her letter of resignation[4] the next day, April 18, 2006. (Def.Mem., Ex. M).

Cunningham asserts that the ultimatum delivered by Smith concerning the handling of indigent patients presented an ethical dilemma for her as a social worker which, if followed, would have been a violation of EMTALA, endangering her license. She alleges that since following Smith's directive would be a violation of EMTALA, she had no choice except to resign. She further alleges that based on these circumstances, she was constructively discharged in violation of the public policy of South Carolina.

In Ludwick v. This Minute of Carolina, Inc., 337 S.E.2d 213 (S.C. 1985), the South Carolina Supreme Court established an exception to South Carolina's common law at-will employment doctrine. It held that "(w)here the retaliatory discharge of an at-will employee constitutes violation of a clear mandate of public policy, a cause of action in tort for wrongful discharge arises." Id. at 216. Ludwick involved an at-will employee who was discharged because she chose to honor a subpoena against her employer's wishes and testify before the South Carolina Employment Security Commission. The Ludwick exception is limited and "applies in cases when an employer requires an employee to violate the law or the reason for the employee's termination was itself a violation of the criminal law." Lawson v. South Carolina Dept. of Corrections, 532 S.E.2d 259, 260-61 (S.C. 2000). With respect to the second part of the exception, S.C. Code Ann. § 16-17-560 provides that "(i)t is unlawful for a person to...discharge a citizen from employment...because of political opinions of the exercise of political rights and privileges guaranteed to every citizen by the Constitution and laws

---

[3] *See also*, Cunningham Deposition, pp. 155-158.

[4] The letter does not specifically reference the April 17 conversation with Smith, but generally cites the "intolerable" environment created by Smith and condoned by management.

4

of the United States or by the Constitution and laws of this State."[5] This statute "makes it a 'crime against public policy' to fire any person in this State because of their political beliefs." Culler v. Blue Ridge Electric Cooperative, Inc., 442 S.E.2d 91, 92 (S.C. 1992) (plaintiff discharged due to refusal to contribute to a political action committee has a wrongful discharge claim under Ludwick and S.C. Code Ann. § 16-17-560).

Although no cases are cited, the parties appear to agree that a constructive discharge may qualify as a termination in violation of the public policy of South Carolina giving rise to a claim. The undersigned concludes that if following Smith's directive would have caused Cunningham to violate the EMTALA, ARMC would not be entitled to summary judgment.

The legislative history and case law following passage of EMTALA "indicates it was intended to prevent 'patient dumping,' the practice of some hospital emergency room turning away or transferring indigents to public hospitals without prior assessment or stabilization treatment." Harry v. Marchant, 291 F.3d 767, 772 (11th Cir. 2002). The EMTALA's "core purpose is to get patients into the system who might otherwise go untreated, and be left without a remedy because traditional medical malpractice law affords no claim for failure to treat." Bryan v. Rector & Visitors of University of Virginia, 95 F.3d 349, 351 (4th Cir. 1996). The EMTALA was enacted because "[u]nder state tort law, hospitals are under no legal duty to provide [emergency care at all]" and the EMTALA's purpose is simply to impose on hospitals the legal duty to provide such emergency care. Brooks v. Maryland Gen. Hosp., Inc., 996 F.2d 708, 710 (4th Cir. 1993).

> EMTALA seeks to achieve the limited purpose of its enactment by requiring that the hospital provide limited stabilizing treatment to or an appropriate transfer of any

---

[5]This criminal offense is a misdemeanor with a maximum fine of $1,000 and/or imprisonment for two years.

>patient that arrives with an emergency condition. 42 U.S.C. § 1395dd(b)(1); *see also* Vickers v. Nash Gen. Hosp., Inc., 78 F.3d 139, 142 (4th Cir.1996) (citing numerous cases). And it defines "to stabilize" as "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual...." 42 U.S.C. § 1395dd(e)(3)(A). The stabilization requirement is thus defined entirely in connection with a possible transfer and without any reference to the patient's long-term care within the system. It seems manifest to us that the stabilization requirement was intended to regulate the hospital's care of the patient only in the immediate aftermath of the act of admitting her for emergency treatment and while it considered whether it would undertake longer-term full treatment or instead transfer the patient to a hospital that could and would undertake that treatment. It cannot plausibly be interpreted to regulate medical and ethical decisions outside that narrow context.

Bryan, 95 F.3d at 352.

The EMTALA does not require the admission and long-term treatment of indigent patients. Such a duty may, of course, arise from other sources. However, on the record before this Court, it is not clear what procedure is employed by ARMC to meet the requirements of EMTALA for indigent psychiatric patients presenting themselves for emergency care. If the ARMC procedure called for the assessment, treatment, and stabilization of such patients in the specialized confines of the Aurora Pavilion, as opposed to its emergency room, then it would appear that Smith's directive may have caused violations of EMTALA. Because questions of facts remain, the undersigned concludes that summary judgment is inappropriate.

## **Conclusion**

Based on a review of the record, it is recommended that Plaintiff's ADEA claim be **dismissed**, Defendant's motion for summary judgment be **denied**, and the case remanded to the

6

Aiken County Court of Common Pleas.



_____
Joseph R. McCrorey
United States Magistrate Judge

Columbia, South Carolina

June 19, 2009